Argued April 4, reversed and remanded July 20, 1977

# HARRELL, *Appellant,*
*v.*
# TRAVELERS INDEMNITY COMPANY, *Respondent.*
## (TC 7344, SC 24627)
567 P2d 1013

Larry C. Hammack, Medford, argued the cause for appellant. With him on the briefs was Haviland, deSchweinitz, Stark & Hammack, Medford.

Patrick Ford, Medford, argued the cause for respondent. With him on the brief was Ford & Cowling, Medford.

TONGUE, J.

Holman, J., dissenting opinion.

Denecke, C. J., joins in this dissent.

Linde, J., dissenting opinion.

**TONGUE, J.**

This is an action to collect from an insurance company a judgment of $25,000 in punitive damages entered against defendant's insured for reckless driving. Plaintiff appeals from a trial court decision on stipulated facts that defendant insurance company is not liable.

Plaintiff was injured in a collision with an automobile driven by defendant's insured, Mrs. Linnie Ames. The jury returned verdicts against Mrs. Ames for $70,000 in compensatory damages and $25,000 in punitive damages. The award of punitive damages, based on evidence that defendant's insured had been guilty of reckless driving after drinking, was affirmed by this court, *Harrell v. Ames,* 265 Or 183, 508 P2d 211, 65 ALR3d 649 (1973).

Defendant paid plaintiff the $70,000 in compensatory damages, but not the $25,000 in punitive damages.[1] Defendant's insured assigned to plaintiff all rights against defendant. The trial court upheld the assignment and plaintiff's right to sue. It concluded, however, that the insurance policy did not cover punitive damages, for two reasons: (1) that the "language" of the insurance policy "does not provide coverage for punitive damages," and (2) that such coverage would be "contrary to the expressed Oregon public policy."

1. *The insurance policy does not exclude liability for punitive damages.*

The insurance policy was issued by defendant to South Coast Lumber Co., an Oregon corporation, and is over 70 unnumbered pages in length, including numerous endorsements. The "named insured," in addition to that corporation, includes, among others,

---

[1]At the time plaintiff brought suit against defendant's insured, defendant undertook defense of the case under a reservation of rights denying any coverage for that portion of the claim based on punitive damages.

"C. V. Ames," husband of Mrs. Ames, and provides that

> "* * * Whenever the named insured also includes individually named insureds, the spouses of such individually named insureds are included if members of the same household."

On a page entitled "Comprehensive Automobile Liability Insurance Coverage Part" it is provided, among other things, that:

> "The company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of * * * *bodily injury* * * * to which this insurance applies, caused by an *occurrence* and arising out of the ownership, maintenance or use * * * of any *automobile* * * *." (Emphasis theirs)

The policy then immediately goes on to state five paragraphs of "exclusions," none of which are claimed to exclude liability for punitive damages.

It is contended on behalf of defendant insurance company that "the only reasonable construction of this policy language and coverage involved in this case" is that "the clear intent of the policy was to provide coverage for *compensatory* damages resulting from bodily injury" and that "since punitive damages are in no sense compensatory" (but are "awarded only as a deterrent to the violation of a societal interest") they are not considered within the coverage. In support of this contention defendant cites *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967), as holding that the purpose of punitive damages in Oregon is "deterrence," and the Missouri case of *Crull v. Gleb,* 382 SW2d 17 (Mo App 1964), as holding (at 23) that such a policy covers only "damages for bodily injury" and that "[p]unitive damages do not fall in this category."

It would appear, however, that the majority of courts hold to the contrary. As an example of the reasoning of such courts, it was stated in *Norfolk & W.*

*Ry. Co. v. Hartford Acc. & Indem. Co.,* 420 F Supp 92, 94 n.1 (ND Ind 1976), that:

"Of course, a threshold question may be posed, whether the language of the insurance contract admits of a construction which allows coverage for punitive damages. *The contract covers 'all sums which the insured shall become legally obligated to pay.'* The contract's explanation of the term 'damages' is that it 'includes' certain items, namely, that it 'includes damages for death [etc.].' The explanation does not attempt to be all-inclusive, and it is in any event a circular definition. The contract nowhere mentions punitive damages, although it was within Hartford's power to exclude such coverage. The policy unambiguously covers *'all sums.' Punitive damages are a form of damages; when liquidated by judgment, they are a 'sum.'* Thus, this contract does not even present such an ambiguity as would call into play the rule that ambiguities in insurance contracts should be resolved in favor of the insured." (Emphasis added)[2]

As also stated in 7 Appleman, Insurance Law and Practice 132, § 4312 (1962):

"* * * [I]t is clear that the average insured contemplates protection against claims of any character caused by his operation of an automobile, not intentionally inflicted. When so many states have guest statutes in which the test of liability is made to depend upon wilful and wanton conduct, or when courts, in an effort to get away from contributory negligence of the plaintiff, permit a jury to find a defendant guilty of wilful and wanton conduct where the acts would clearly not fall within the common law definitions of those terms, the insured expects, and rightfully so, that his liability

---

[2] Among other cases to the same effect, see *Price v. Hartford Acc. & Indem. Co.,* 108 Ariz 485, 502 P2d 522, 523 (1972), and *Abbie Uriguen Olds. Buick, Inc. v. United States F. I. Co.,* 95 Idaho 501, 511 P2d 783, 789 (1973); *Concord General Mutual Insurance Company v. Hills,* 345 F Supp 1090, 1095 (SD Maine 1972); *United States Fidelity & Guaranty Co. v. Janich,* 3 FRD 16, 19 (SD Calif 1943); *Carroway v. Johnson,* 245 SC 200, 139 SE2d 908, 910 (1965).

under those circumstances will be protected by his automobile liability policy."

and (at 136):

"Of course, a policy could expressly exclude liability arising from wilful and wanton acts * * *."

and also (at 86) Supp (1972):

"In any event a Court should not aid an insurer which failed to exclude liability for punitive damages.* * *"

Although this court has not previously decided this precise question, we believe that the reasoning as stated by these authorities is in accord with the reasoning adopted by this court in other cases involving the interpretation of insurance policies. Thus, in *Chalmers v. Oregon Auto Ins. Co.,* 262 Or 504, 508-09, 500 P2d 258 (1972), we restated the effect of such cases as follows:

"* * * [A]lthough an insurance company is ordinarily entitled to the enforcement of an insurance policy as written by the company if its terms are clear and unambiguous, in the event of an ambiguity in the terms of an insurance policy, any reasonable doubt will be resolved against the insurance company and in favor of extending coverage to the insured. * * *

"* * * [W]hile the primary rule of contract interpretation, including insurance contracts, is to ascertain the intent of the parties, if possible, it is nevertheless established in Oregon that when a policy of insurance is ambiguous it 'should be construed * * * in the sense in which the insured had reason to suppose it was understood.' (Citing cases)"

Upon the application of these rules to the provisions of this insurance policy, we hold that such provisions were ambiguous, at the least, so as to require the resolution of any reasonable doubts against the insurance company; that upon reading the policy provisions as set forth above, and in the absence of any express exclusion of liability for punitive damages, a person insured by such a policy would have reason to suppose that he would be protected against liability for "all sums" which the insured might become "legally obli-

[ 204 ]

gated to pay" and that the term "damages" would include all damages, including punitive damages which became, by judgment, a "sum" that he became "legally obligated to pay."

Defendant insurance company could have removed this ambiguity easily by including an express exclusion from liability for punitive damages, but apparently chose not to do so. As stated by Appleman, *supra* (at 86 Supp), "there is nothing in the insuring clause that would forewarn an insured that such was to be the intent of the parties," if indeed, such was the intent of the insurance company.

2. *The provision of this insurance contract under which defendant undertook to provide protection from liability for punitive damages is not void as against public policy.*

Defendant next contends that if even the provisions of its policy be construed so as to impose liability for punitive damages, such provisions would then be invalid as contrary to the public policy of Oregon to the effect that the sole purpose of punitive damages in Oregon is to act as "a punishment and deterrent for anti-social conduct" and that "to do otherwise would result in the diminishment of punitive damages as a deterrent."

In support of that contention defendant states that "this is a case of first impression in Oregon" on this question and then cites an Annotation in 20 ALR3d at 343 (1968), which (according to defendant) indicates a clear split of authority among other courts.

(a) *"Public policy" as a basis for a declaration by a court that an existing contract is void.*

It is important to bear in mind at the outset that this case does not involve the application of any settled and established rule of contract "public policy," but the adoption in Oregon of a proposed new rule of "public policy" under which both existing and future insurance contracts which undertake to provide protection

from liability for punitive damages would be held to be invalid.

It has been said of "public policy" as a ground for invalidation by the courts of private contracts that "those two alliterative words are often used as if they had a magic quality and were self-explanatory * * *"[3] and that for a court to undertake to invalidate private contracts upon the ground of "public policy" is to mount "a very unruly horse, and when you once get astride it you never know where it will carry you."[4]

In *Eldridge et al v. Johnston,* 195 Or 379, 405, 245 P2d 239 (1952), we said:

"In considering the contract executed by defendant, we are confronted with more than one principle of public policy. It is elementary that public policy requires that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice, and it *is only when some other over-powering rule of public policy,* such as the rule against perpetuities, intervenes, rendering such agreement illegal, that it will not be enforced. * * *"[5] (Emphasis added)

As a test to be applied in determining whether a contract should be held invalid as contrary to public policy, this court, in *Pyle v. Kernan,* 148 Or 666, 673-74, 36 P2d 580 (1934), held that:

" '* * * The test is the *evil tendency* of the contract and not its actual injury to the public in a particular instance.' * * *" (Citing numerous authorities) (Emphasis added)

Applying this test to contracts of insurance it is

---

[3] 6A Corbin on Contracts 10, § 1375 (1962).

[4] 14 Williston on Contracts 7-8, § 1629 (3d ed 1972).

[5] To the same effect, see *Bliss v. Southern Pacific Co. et al,* 212 Or 634, 646, 321 P2d 324 (1958), and 14 Williston, *supra* n. 4, at 11, § 1629, and 6A Corbin, *supra* n. 3, at 19, § 1373.

For further discussion of "judicial restraint in the use of public policy as a tool in the decision making process," *see* Note, 47 Temple LQ 748, 751 and 758 (1974).

stated in 6A Corbin on Contracts 587-88, § 1471 (1962), that:

> "Liability insurance policies, taken out by employers, owners of automobiles, and others, are contracts for indemnity against consequences of tortious negligence on the part of servants and employees. *Such contracts are not made illegal by the fact that they provide for indemnity against consequences of the negligent conduct of the employer or owner himself. It is not believed that harmful negligence is made more probable by such indemnification:* * * *." (Emphasis added)

In *Isenhart v. General Casualty Co.,* 233 Or 49, 52-53, 377 P2d 26 (1962), we held that:

> "It is generally held that it is contrary to public policy to indemnify the insured for losses arising out of his commission of an *intentional act which causes damage to another.* * * *" (Emphasis added)

and that

> "A contract to indemnify the insured for damages he is forced to pay as a result of an *intentionally inflicted injury* upon another should not be regarded as contrary to public policy unless the fact of insurance coverage can be *related in some substantial way* to the commission of wrongful acts of that character. * * *" (Emphasis added)

*See also Ferguson v. Birmingham Fire Ins.,* 254 Or 496, 506, 460 P2d 342 (1969).

This case, however, does not involve an "intentionally inflicted injury," as in *Isenhart,* but conduct claimed to have been "reckless." It has long been recognized that there is no empirical evidence that contracts of insurance to protect against liability for negligent conduct are invalid, as a matter of public policy, because of any "evil tendency" to make negligent conduct "more probable" or because there is any "substantial relationship" between the fact of insurance and such negligent conduct. Neither is there any such evidence that contracts of insurance to protect against liability for punitive damages have such an "evil tendency" to make reckless conduct "more probable" or that there is any "substantial relationship"

[ 207 ]

between the fact of such insurance and such misconduct. Conversely, neither is there any such evidence that to invalidate insurance contract provisions to protect against liability for punitive damages on grounds of public policy would have any substantial "tendency" to make such conduct "less probable," i.e., that to do so would have any "deterrent effect" whatever upon such conduct.[6]

To the same effect, it was observed in a concurring opinion in *Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn 639, 652, 383 SW2d 1, 7 (1964), one of the leading cases holding that a contract of insurance against liability for punitive damages is not invalid or contrary to public policy, in rejecting the contention that such insurance would "result in increased recklessness," that

> "In the early years of the casualty insurance business it was argued by some that by allowing one to insure against his own negligent acts that carelessness would be encouraged, resulting in increased injuries and deaths on the highways. * * *"

As also stated in *Lazenby* (at 5):

> "* * * [T]o say the closing of the insurance market in the payment of punitive damages, would act to deter guilty drivers would in our opinion contain some element of speculation."

To the same effect, as observed in *Price v. Hartford Accident and Indemnity Company,* 108 Ariz 485, 502 P2d 522, 524 (1972):

> "* * * [T]here is no evidence that those states which deny coverage [for liability against punitive damages] have accomplished any appreciable effect on the slaughter on their highways. * * *"

(b) *The scope of conduct subject to punitive damages.*

■ In considering whether this court should hold that

---

[6] *See* Zuger, *Insurance Coverage of Punitive Damages,* 53 ND L Rev 239, 256 (1975).

an insurance contract between an automobile owner and an insurance company to provide protection from liability for punitive damages is invalid as contrary to the public policy of the State of Oregon, this court must also consider the results that must then follow once this court has "mounted the unruly horse" of "public policy."

If it were true that a person only becomes liable for punitive damages upon engaging in an "intentionally inflicted injury upon another," as under the rule of public policy stated by that court in *Isenhart v. General Casualty Co., supra,* the results flowing from the rule proposed by defendant and as adopted by the trial court would not be so far reaching. That proposed rule, however, is not so limited, but would hold that a contract of insurance against liability for punitive damages is invalid *per se* as a contract contrary to public policy, i.e., as applied to a judgment for punitive damages based upon *any conduct* for which punitive damages may properly be awarded.

This court held in *Starkweather v. Shaffer,* 262 Or 198, 207, 497 P2d 358 (1972), that "[p]unitive damages are recoverable" in Oregon in all cases in which

"* * * the violation of societal interests is sufficiently great and the conduct involved is of a kind that sanctions would tend to prevent."[7]

Indeed, this court has held that even "gross negligence" may provide a proper basis for an award of punitive damages.[8] It necessarily follows that if the rule proposed by defendant were adopted, the conduct subject to possible liability for punitive damages, and which could no longer be the subject of protection by a valid contract of insurance, would include a wide spectrum of conduct that would impose liability not only upon automobile drivers, but also upon business

---

[7] *See also Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 435 P2d 306 (1967).

[8] *See Noe v. Kaiser Foundation Hosp., supra* n. 7, at 423, and cases cited therein.

[ 209 ]

and professional persons, firms and corporations, as well as upon ordinary persons when engaged in a wide variety of activities. As examples:

(1) A physician whose treatment of a patient is such that a jury could properly find that it was "grossly negligent" may be held liable for punitive damages—a liability for which protection by insurance would no longer be available.[9]

(2) Any creditor who has occasion to repossess personal property pledged as security for an unpaid debt may be subject to the same uninsurable liability for punitive damages if his conduct is such that a jury may properly find that he acted with "improper motives" and in "utter disregard" of plaintiff's rights, even though the defendant exercised what he believed to be a legal right.[10]

(3) The owner of a retail store who causes the arrest and prosecution of a suspected shoplifter under circumstances not sufficient to constitute "probable cause" may also have an uninsurable liability for punitive damages because the jury may make a finding of malice based upon lack of probable cause.[11]

(4) One whose business involves the operation of a plant which emits smoke, fumes or "particulates" may also have an uninsurable liability for punitive damages, even in the absence of any "wanton" or "fraudulent" conduct, upon the ground that he has "intentionally" permitted fumes, smoke or particles to be released and blown by the wind upon another's property, for the reason that "[t]he intentional disregard of the

---

[9] *See Noe v. Kaiser Foundation Hosp., supra* n. 7, at 423, and cases cited therein. *See also* Hodel, *Exemplary Damages in Oregon,* 44 Or L Rev 175, 212-14 (1965).

[10] Although the Oregon cases may not be entirely clear on this point, *see: Pelton v. Gen. Motors Accept. Corp.,* 139 Or 198, 204, 7 P2d 263, 9 P2d 128 (1932), overruled on another point in *Stroud v. Denny's Restaurant,* 271 Or 430, 532 P2d 790 (1975). *See also* Hodel, *supra* n. 9, at 223-25.

[11] *See Gustafson v. Payless Drug Stores,* 269 Or 354, 366, 525 P2d 118 (1974); *Fleet v. May Dept. Stores, Inc.,* 262 Or 592, 604-05, 500 P2d 1054 (1972).

interest of another is the legal equivalent of legal malice and justifies punitive damages for trespass."[12]

(5) The operator of a retail store who sells any goods in a package which bears representation which he "knows" or "*should know*" to be "false or *misleading*" or who engages in any practice which he "knows" or "should know" to be "*unfair or deceptive,*" contrary to the provisions of the Oregon Unlawful Trade Practices Act, may also be subject to an uninsurable liability for punitive damages.[13]

Under the rule proposed by the defendant, and as held by the trial court, even though the risks involved in each of these examples were of such a nature as to be encountered in the operation of such business or professions, and the conduct involved did not involve "intentionally inflicted injury," any contract with an insurance company to provide protection against the risk of punitive damages as the result of such conduct would become invalid as a matter of "public policy," regardless of whether the insurance contract was negotiated upon payment of an additional premium for protection against such liability.

In the well-recognized and often-cited article by Hodel, *Exemplary Damages in Oregon,* 44 Or L Rev 175 (1965), the conclusion is reached (at 240), after a review of the decisions by this court, that although it may be proper not to permit insurance coverage for punitive damages "if nothing less than wanton misconduct will support an award of [punitive] damages," the "reason for the prohibition of such insurance ceases to exist" when no more than gross negligence is held to be sufficient for such an award.

This is in accord with the view as stated in the

---

[12] *McElwain v. Georgia-Pacific,* 245 Or 247, 249, 421 P2d 957 (1966). *See also* Note, 46 Or L Rev 477 (1967).

[13] *See* ORS 646.605, 646.608 and 646.638. *See also Scott v. Western Int. Sales, Inc.,* 267 Or 512, 517 P2d 661 (1973).

concurring opinion in *Lazenby v. Universal Underwriters Ins. Co., supra,* at 7 that:

> "The line of demarcation between the allowance of punitive damages and compensatory only is too thin and exacting in my opinion to apply [insurance] coverage in the one case and deny coverage in the other. * * *"[14]

**(c)** *The "shift of the burden" argument.*

The case on which defendant places its principal reliance as the one case which "most clearly and forcefully" states its position is *Northwestern National Casualty Company v. McNulty,* 307 F2d 432 (5th Cir 1962), in which that court reasoned (at 440-41) as follows:

> "The policy considerations in a state where, as in Florida and Virginia [and Oregon], punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong. If that person were *permitted to shift the burden to an insurance company,* punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And *there is no point in punishing the insurance company;* it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, *the burden would ultimately come to rest* not on the insurance companies but *on the public,* since the added liability to the insurance companies would be passed along to the premium payers. *Society would then be punishing itself*

---

[14] As also observed by the concurring opinion in *Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn 639, 652, 383 SW2d 1, 8 (1964):

"* * * [R]egardless of how careful the operator may be, situations could and do arise where the jury would feel warranted on the facts of the case in awarding punitive damages when another jury, on the same facts, would feel warranted in denying punitive damages."

Indeed, this court has said, in all frankness, in *Cook v. Kinzua Pine Mills Co. et al,* 207 Or 34, 58, 293 P2d 717 (1956), that:

"The courts are constantly confused and frustrated by the over-generous employment of adjectives in describing wrongful conduct, and the difficulty becomes well-nigh insurmountable when the attempt must be made to draw the line which marks the boundaries of different kinds of liability."

*for the wrong committed by the insured."* (Emphasis added)

In our view, it is naive at least, if not pure fiction, to hold that an insurance contract against liability for punitive damages is invalid as contrary to public policy because such a contract would "shift the burden" to an insurance company so as to either "punish" it or have it pass that burden "on [to] the public," so as to "punish society."

On the contrary, an insurance company which deliberately enters into a contract to provide coverage against liability for punitive damages is free to charge either a separate or additional premium for that risk. Conversely, if an insurance contract excludes coverage for liability against punitive damages no such additional premium need be charged and the insurance company may charge a lower premium for such a policy.

Thus, in the event that an insured who has a contract of insurance which includes coverage for punitive damages incurs a judgment for punitive damages, he does not "shift the burden" of that judgment to an unsuspecting insurance company so as to "punish it" and, through it, to "punish society." Instead, he and others desiring to contract for that additional coverage have presumably paid additional premiums for such coverage, so as to provide a separate fund of moneys collected by the insurance company for the express purpose of paying such judgments, without "punishment" to either the insurance company or "society."

■ It follows, in our opinion, that the reasoning upon which the *McNulty* opinion is based (as adopted by defendant) is fallacious. At the least, that reasoning fails, in our opinion, to provide a clear and "overpowering" rule of public policy, as is required before this court can properly interfere with the freedom of

[ 213 ]

private parties in the negotiations of the terms of a contract upon the ground of "public policy."[15]

(d) *Vicarious liability.*

Defendant would distinguish some of the cases relied upon by plaintiff upon the ground that they involve vicarious liability for punitive damages. Thus, defendant suggests that insurance contracts by corporations and other employers for protection against vicarious liability may not be contrary to public policy because an award of punitive damages against such a defendant, rather than against the person guilty of the misconduct, would not act as a deterrent, while an insurance contract by a person, firm or corporation for protection against punitive damages resulting from his or its own conduct would be invalid as against public policy because of the deterrent effect of a judgment for punitive damages as against such a defendant.

What the defendant fails to say, however, is that under the decisions by this court the basis for the imposition of vicarious liability for punitive damages upon a corporation or other employer is also one of deterrence—i.e., the deterrent effect upon an employer of an award of punitive damages by encouraging him to exercise closer control over his employees.[16]

It is significant to note, however, that when liability for a judgment of punitive damages is imposed upon a large corporation, or even upon an individual business or professional person with a profitable and well-established business or profession, the financial "burden" of such a judgment is then usually "shifted," if not to an insurance company, then to the public in the form of its customers or consumers. Thus, there

---

[15] *See* 14 Williston on Contracts 11, § 1629 (3d ed 1972); *Eldridge et al v. Johnston,* 195 Or 379, 405, 245 P2d 239 (1952), as previously quoted, and *Bliss v. Southern Pacific Co. et al,* 212 Or 634, 646, 321 P2d 324 (1958).

[16] *See Stroud v. Denny's Restaurant,* 271 Or 430, 434-37, 532 P2d 790 (1975).

would be the same "shifting of the burden" which provides a primary basis for the rule as proposed by the defendant, as previously noted.[17] On the other hand, unless an individual business or professional person who is less well-established or affluent can insure against such liability, it may not be possible for him to so "shift" the burden of a judgment for punitive damages, depending upon its size. Indeed, for such a person a large judgment for punitive damages may well be a permanent financial disaster because such a judgment is not dischargeable in bankruptcy.[18]

The result of such a disparity may well be to encourage small businessmen to incorporate, so as to be able to protect themselves against such a financial disaster by having the corporation purchase insurance against punitive damages. Indeed, it is of interest to note that the insurance policy in this case was one issued to a lumber corporation and also named as an "insured" the husband of the defendant whose reckless conduct resulted in the judgment for punitive damages involved in this case.

Under the rule proposed by the defendant and adopted by the trial court, however, such possible protection would not be available to a professional person or wage earner or to a housewife or retired person, who might well be ruined financially by a judgment for punitive damages as the result of conduct of no more flagrancy than an act of "gross negligence," a momentary "reckless" act, or conduct "contrary to societal interests."

---

[17] As stated in Zuger, *supra* n.6, at 257:

"This raises another interesting point. Apparently the majority of courts find little difficulty on the public policy ground with the shifting of responsibility for punitive damages from the wrongdoer to the innocent employer. Yet, some of these same courts base their rejection of insurance coverage on the principle that responsibility for wrongful conduct ought not to be shifted from the original wrongdoer to an innocent party, namely the insurance company. * * *"

[18] *See* 8 Remington on Bankruptcy 192, § 3328 (Henderson ed 1955), and 1976 Pocket Part 92-93.

*Summary.*

There may be other alternatives that would be preferable to the present state of the law in Oregon on the subject of punitive damages, such as:

(1) The complete elimination of punitive damages;

(2) Some limitation upon the amount of awards for punitive damages;

(3) A limitation of liability for punitive damages to flagrant misconduct, such as intentionally inflicted injury.

Some of these possible alternatives might more appropriately be considered by the legislature, rather than by the courts. In any event, none of them are proposed by either party to this case and we do not think it appropriate to consider any of them in this case.

It may also develop that insurance companies will refuse to insure for punitive damages and will make this clear by policy provisions setting forth specific exclusions for such liability. But as long as insurance companies are willing, for a price, to contract for insurance to provide protection against liability for punitive damages to persons or corporations deemed by them to be "good risks" for such coverage, and as long as liability for punitive damages continues to be extended to "gross negligence," "recklessness," and for other conduct, "contrary to societal interests," we are in agreement with those authorities which hold that insurance contracts providing protection against such liability should not be held by courts to be void as against public policy.[19]

---

[19] As stated in the concurring opinion in *Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn 639, 383 SW2d 1, 8 (1964):

"* * * [I]f the insurance industry feels that punitive damages protection should not be afforded under automobile liability policies, it can very easily make a provision in the exclusions section to that effect.

It is one thing for an insurance company to write a policy with provisions which exclude liability for punitive damages and to ask that this court construe and apply such policy provisions. It is quite another thing, however, for an insurance company which has written and issued an insurance policy in terms which include coverage for punitive damages—presumably at a premium which the insurance company believed to be sufficient as consideration for such coverage—to ask this court to relieve it from such liability under its own insurance contract by a judicial declaration that the contract is void for reasons of "public policy."[20]

Until this is done, I am of the opinion that the insured should receive the coverage sought to be denied in this case."

Although, as stated by the defendant, the courts may be about equally divided on this question, there is some indication that the trend of the more recent cases is toward this view, Obler, *Insurance for Punitive Damages: A Reevaluation,* 28 Hastings LJ 431, 443 (Nov 1976). *See also* 7 Appleman, Insurance Law and Practice 1962 Supp 86, § 4312 (1972). *See generally* Prosser, Law of Torts 13, § 2 (4th ed 1971); 7 Appleman, *supra,* at 133, § 4312; and 15 Couch, Insurance 2d 700, § 56.27 (1966).

*See also* Note, 1 Will LJ 640, 645-56 (1961), and 7 Am Jur 2d, Automobile Insurance 538, § 196 (1963).

It is of interest to note that no other court in a western state has adopted the *Northwestern National Casualty Company v. McNulty,* 307 F2d 432, 440-41 (5th Cir 1962), view. The two western courts which have considered this question have expressly rejected that view and have adopted the view advocated by this opinion. *See Price v. Hartford Accident and Indemnity Company,* 108 Ariz 485, 502 P2d 522 (1972), and *Abbie Uriguen Olds. Buick, Inc. v. United States F.I. Co.,* 95 Idaho 501, 511 P2d 783, 789 (1973).

[20] *Cf. Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn 639, 383 SW2d 1, 5 (1964).

As also stated in *Price v. Hartford Accident and Indemnity Company,* 108 Ariz 485, 502 P2d 522, 525 (1972):

"On page 86 of the cumulative supplement to volume 7 of Appleman's work, we find the following:

" 'In any event a court should not aid an insurer which fails to exclude liability for punitive damages. Surely there is nothing in the insuring clause that would forewarn an insured that such was to be the intent of the parties.'

"It is our holding that the premium has been paid and accepted and the protection has been tendered, and that under the circumstances public policy would be best served by requiring the insurance company to honor its obligation."

When we are called upon to weigh all of the various factors and conflicting argument, as we must do in arriving at a decision whether there are "overpowering" reasons why any contract should be held invalid as contrary to public policy, we find ourselves in agreement with the conclusion reached by Hodel, *supra,* as previously noted,[21] and with those courts which have declined to rule that a contract of insurance to provide protection from liability for punitive damages is, *ipso facto,* invalid for reasons of "public policy."

For all of these reasons the judgment of the trial court is reversed and the case is remanded with instructions to enter judgment against defendant in the sum of $25,000, representing the amount of the judgment for punitive damages against defendant's insured, and for other appropriate proceedings not inconsistent with this opinion.[22]

---

[21] *See* Hodel, *Exemplary Damages in Oregon,* 44 Or L Rev 175, 240 (1965), as quoted above.

[22] It would serve no useful purpose to discuss the dissenting opinions in detail, including all of the statements with which we disagree. Suffice to say, that the essence of our disagreement arises from the fact that awards of punitive damages are not limited to wanton or intentional misconduct, but extend to conduct that is grossly negligent or reckless.

We would point out, however, that we have not overlooked our previous decision in *Butler v. United Pacific Ins. Co.,* 265 Or 473, 509 P2d 1184 (1973), which, according to the principal dissent, adopts a "rationale [that] is equally applicable here." We would point out that although some of the language in *Butler* lends support to the position of that dissent, *Butler* involved the terms of a bond required by statute of all automobile dealers, rather than the terms of a contract of insurance as negotiated between private parties.

ORS 481.310 requires automobile dealers to have surety bonds under which any person who "suffers any loss or damages by reason of the fraud * * * by a licensed dealer" shall have a right of action against both the dealer and also "against the surety on the bond." Thus, this court did not hold in *Butler* that a *contract of insurance* was invalid as contrary to public policy. Indeed, it could not hold that a bond required by statute was contrary to public policy. Thus, the net effect of that decision was no more than to interpret the provisions of a statutory surety bond as not imposing liability upon a surety for a judgment of punitive damages against an automobile dealer.

**HOLMAN, J.,** dissenting.

I must dissent from the holding that it is proper to enforce the insurance contract so as to relieve the insured tortfeasor of liability for punitive damages. The majority rejects both logic and precedent in order to reach what is to it a desired result.

One of the most serious problems with the majority's holding is not even discussed in the majority opinion, and that is that the holding is directly contrary to *the established law for this particular award of punitive damages.* In *Harrell v. Ames,* 265 Or 183, 508 P2d 211, 65 ALR3d 649 (1973), involving this accident, this court upheld a judgment based upon a jury verdict that the insured, Mrs. Ames, ought to be liable for punitive damages for her conduct in the sum of $25,000. The jury awarded that amount in response to the following instruction:

> "Punitive damages are awarded to the plaintiff in addition to general damages *in order to discourage the defendant and others from engaging in wanton misconduct. * * *.*
>
> "* * * * *.
>
> "If you so decide to award punitive damages, you may properly consider the following three items in fixing the amount:
>
> "First, the character of the defendant's conduct; second, the defendant's motive; third, *the amount of damages which would be required to discourage the defendant and others from engaging in such conduct in the future.* (Emphasis added.)
>
> "* * * * *."

In affirming this award against a challenge that it was improper to award punitive damages under the circumstances, we justified our holding as follows:

> "Indeed, the fact of common knowledge that the drinking driver is the cause of so many of the more serious automobile accidents is strong evidence in itself to support the need *for all possible means* of deterring persons from driving automobiles after drinking, *includ-*

*ing exposure to awards of punitive damages* in the event of accidents." (Emphasis added.) 265 Or at 190.

The majority now holds exactly the opposite for the same award: it holds that the insured should not be exposed to an award of punitive damages but that she should be allowed to protect herself against such exposure by insurance. One must conclude that *Harrell v. Ames* is now overruled. Even that conclusion, however, would not explain the majority's result. If *Harrell v. Ames* was wrong and Mrs. Ames should not be punished by being required to pay $25,000 so that she and others will be deterred from similar future action, then the judgment for punitive damages should not have been entered and should not be enforced, because there is no reason to justify it. The jury was told to award an amount which it thought proper to deter, and it decided on the amount of $25,000, not the amount of an insurance premium. Despite what the majority may think that the law should be in the future, it offers no explanation for ignoring the law we have established *for this award of punitive damages.*

Insofar as the future is concerned, the majority takes a step that is illogical and contrary to our precedent. It removes liability for punitive damages from the person on whom the damages were meant to have a deterrent effect and enforces them against an insurance company on which they can have no deterrent effect. The majority does not seem to realize that logic limits its choices and that the only logical way it could reach the result it desires (allowing plaintiffs to recover punitive damages without requiring defendants to be individually responsible for them) would be to change the rationale for punitive damages. This change would require overruling literally hundreds of cases going back at least as far as *Martin v. Cambas,* 134 Or 257, 261, 293 P 601 (1930). There are other methods of solving the problem, such as abolishing punitive damages or holding that punitive damages do not deter drunken driving, but these solutions would not meet with the first part of the majority's desires.

The majority opinion purports to distinguish an Oregon case in which we decided a similar problem and which, on principle, cannot be distinguished from the present case. In *Butler v. United Pacific Ins. Co.,* 265 Or 473, 509 P2d 1184 (1973), plaintiff secured a judgment against an automobile dealer for both actual and punitive damages because of fraud. Plaintiff then brought an action against the dealer's surety, on the bond required by statute of all dealers, to recover the amount of the judgment. The issue on appeal was whether the punitive damage part of the judgment could be recovered against the surety. This court held it could not be recovered, saying:

> "In the present case, unlike [*Stirling v.*] *Dari-Delite* [262 Or 359, 498 P2d 753 (1972)], punitive damages were not awarded both as a penalty and to compensate the plaintiff for any expenses, inconvenience, or other injury he suffered. Punitive damages were a penalty assessed against a fraudulent automobile dealer for the purpose of deterring that dealer and others from fraudulent conduct. Punitive damages are a common-law creation and this court has restricted their use as to this purpose. *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967); *Davis v. Georgia-Pacific,* 251 Or 239, 245, 445 P2d 481 (1968). An award of punitive damages against the surety would not be a likely deterrent." 265 Or at 477.

The majority now suggests in a footnote[1] that its decision does not affect our decision in *Butler.* This suggestion is particularly odd given that *Butler* was argued under the assumption that "in this jurisdiction liability insurance carriers are not liable for punitive damages." 265 Or at 475, n 1. Of course in *Butler* we were not faced with a contract of insurance, but we were faced with a contract of surety, executed pursuant to a statutory requirement. While the statute might have controlled our decision, we found that it was not sufficiently clear. In reaching a conclusion, we relied instead on the well-established policy behind

---

[1]Footnote 22 in the majority opinion.

punitive damages, which the majority now rejects: that punitive damages, if they are to be paid at all, ought to be paid by the tortfeasor and not by a surety or insurer. We said:

> "We are of the opinion, however, that the better reasoning is that the statute is not clear whether the surety should be held for punitive damages. The purpose of punitive damages is to deter. Requiring the surety to pay a judgment for punitive damages likely will not be a deterrent to automobile dealers; therefore, no recovery for punitive damages should be allowed." 265 Or at 478.

The portion of the majority opinion which discusses the role of public policy in contract law claims that this case involves the adoption of a new rule of public policy. This simply is not true. There is nothing new about the policy of deterrence in punitive damage awards. *See Martin v. Cambas,* 134 Or 257, 261, 293 P 601 (1930). Nor is there anything new in the idea that to carry out that policy, punitive damage liability ought not to be shifted, *Butler v. United Pacific Ins. Co., supra.* The majority opinion then goes on to indicate that courts should be very reluctant to frustrate contracts on principles of public policy. This represents a major departure for this court. *See, e.g., Real Good Food v. First National Bank,* 276 Or 1057, 557 P2d 654 (1976), which holds on the basis of public policy that a bailee for hire cannot contract against liability for negligent keeping of the goods.

The essential failing of the majority's "public policy" discussion is its lack of any actual public policy analysis. We ordinarily enforce contracts so as to protect the reasonable expectations of the contracting parties. In this case we may assume that the insured expected not to be liable for punitive damages, but our analysis should not stop there. "Since it is the task of the law to form and project, as well as mirror and reflect, we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society." *United States v. White,* 401 US 745, 786, 91 S Ct 1122, 28 L Ed 2d 453

(1971) (Harlan, J.). I see nothing reasonable or desirable in protecting an insured's expectation of being above the law of punitive damages.

This court acknowledged in *Harrell v. Ames* that the insured in the present case could have been subject to criminal sanctions for her conduct. 265 Or at 189. The major purpose of such sanctions would be identical to the purpose of punitive damages, *i.e.,* deterrence. *Roshak v. Leathers,* 277 Or 207, 211, 560 P2d 275 (1977). I would have said that if the insured's insurance contract protected her from liability for a criminal fine for her conduct, this court would not enforce the contract, because to do so would eliminate the deterrent effect of the fine. Under the majority's reasoning, however, the contract would have to be enforced, on the theory that the policy of enforcing the insured's contract outweighs the policy of deterring her conduct.

The majority states that there is no evidence that insurance against punitive damage liability affects deterrence. This statement is inconsistent with the following statements in *Harrell v. Ames, supra,* 265 Or at 190-91, written about the same situation:

> "It may be debatable whether either awards of punitive damages or the imposition of criminal penalties will effectively deter persons from driving after drinking. However, in the absence of a showing of substantial evidence to the contrary, we are not prepared to hold that law enforcement officials and courts, who have a heavy responsibility in this area, are wrong in their present apparent assumption that both criminal penalties and awards of punitive damages may have at least some deterrent effect in dealing with this serious problem. We are also not aware of any good reasons why punitive damages should not have as much deterrent effect upon this type of wanton and reckless conduct as upon other types of conduct in which awards of punitive damages are traditionally approved by the courts." (Footnotes omitted.)

The majority offers no explanation of how, if punitive damages have a deterrent effect, the ability to escape

punitive damages through insurance does not interfere with that deterrence.

The majority apparently fails to understand what it calls the "shift of the burden" argument. The argument was stated by Judge Wisdom in *Northwestern National Casualty Company v. McNulty*, 307 F2d 432, 440-41 (5th Cir 1962), as follows:

> "The policy considerations in a state where, as in Florida and Virginia [and Oregon], punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured."

The point is not, as the majority seems to think, that punitive damages would "punish" insurance companies that contract to pay them. The point is that they would not "punish" anybody and therefore would serve no purpose. The majority does not answer this basic point.

The majority provides an economic analysis of the effect of punitive damages on "well-established" businesses which must be labeled, in the majority's own words, "naive at least, if not pure fiction." The majority assumes that such businesses will be able to shift the burden of punitive damage awards to their customers. If the businesses are faced with price competition, this will simply not be true. Even well-established businesses must keep their expenses at a minimum. It is for this reason that considerable effort

is spent on avoiding additional taxation. I would expect comparable effort to be spent on avoiding punitive damage awards; in short, I would expect punitive damages to have a deterrent effect. If they would not, there is no reason for their existence and they should be abolished.

The majority's expressions of concern about the possible financial ruin of less affluent defendants seem exaggerated, if not disingenuous. For just this reason the law of punitive damages requires that the wealth of a defendant is a matter to be considered by a jury in setting such damages. *Phelan v. Beswick,* 213 Or 612, 617-18, 326 P2d 1034 (1958). This consideration tends to protect less affluent defendants. The majority's holding, however, has no tendency to protect less affluent defendants. Protection by insurance coverage of punitive damages will be available only to those who contract for it, that is, to those who know they need it and are able to pay for it. The majority holding will therefore tend to protect people who have wealth and sophistication in legal matters. Such people will now be able to place themselves above the law of punitive damages.

Perhaps the most puzzling part of the majority opinion is its discussion of the scope of conduct subject to punitive damages. Apparently, this part of the opinion is intended to point out the practical considerations which justify, in the majority's view, an abandonment of logic and precedent. It cites as examples several cases in which this court approved awards of punitive damages for various conduct. It is not clear whether the majority wishes to overrule these cases. If the majority does not disapprove of these cases, the only explanation of them consistent with the majority opinion is that in each case this court approved an award of punitive damages, presumably for the purpose of deterrence, without intending the defendant to pay it.

In its concluding summary, the majority pays lip

service to the idea of limiting or eliminating punitive damages. It suggests that this might be a matter best left to the legislature, presumably in its next session two years from now. If there is a problem with the scope of punitive damages in Oregon, it has been created by this court, and this court should attempt to solve it. In the past this court has at least limited punitive damages to cases in which they served the public policy of deterrence. In the present case it abandons that limitation. Instead, it is satisfied to allow the foresighted and affluent to place themselves above the policy of the law of punitive damages through the purchase of insurance, while the less foresighted and less affluent remain subject to the law as before. This is a solution which I cannot, in good conscience, accept.

It is true that some other courts have reached the same result as the majority. Numerically, the cases in the United States are equally divided on the question. See Annotation, 20 ALR3d 343 (1968). The following cases permit the shift of liability for punitive damages from a wrongdoer to an insurer: *Price v. Hartford Accident and Indemnity Company,* 108 Ariz 485, 502 P2d 522 (1972); *Southern Farm Bureau Casualty Ins. Co. v. Daniel,* 246 Ark 849, 440 SW2d 582 (1969); *Abbie Uriguen Olds. Buick, Inc. v. United States F.I. Co.,* 95 Idaho 501, 511 P2d 783 (1973); *Continental Insurance Companies v. Hancock,* 507 SW2d 146 (Ky 1974); *Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn 639, 383 SW2d 1 (1964); and *Dairyland County Mutual Ins. Co. v. Wallgren,* 477 SW2d 341 (Tex Civ App 1972). The following cases hold that public policy prohibits such a shift of liability: *American Surety Company of New York v. Gold,* 375 F2d 523, 20 ALR3d 335 (10th Cir 1966); *Northwestern National Casualty Company v. McNulty,* 307 F2d 432 (5th Cir 1962); *Norfolk & W. Ry. Co. v. Hartford Acc. & Indem. Co.,* 420 F Supp 92 (ND Ind 1976); *Tedesco v. Maryland Casualty Co.,* 127 Conn 533, 18 A2d 357, 132 ALR 1259 (1941); *Nicholson v. American Fire and Casualty*

*Ins. Co.,* 177 So2d 52 (Fla App 1965); *Crull v. Gleb,* 382 SW2d 17 (Mo App 1964); *Padavan v. Clemente,* 43 App Div 2d 729, 350 NYS2d 694 (1973); *Teska v. Atlantic National Insurance Co.,* 59 Misc2d 615, 300 NYS2d 375 (1969); and *Esmond v. Liscio,* 209 Pa Super 200, 224 A2d 793 (1966).

The legal writers are almost unanimous in supporting the position that punitive damage liability should not be shifted by insurance. Gonsoulin, *Is an Award of Punitive Damages Covered Under an Automobile or Comprehensive Liability Policy?,* 22 SW L J 433 (1968); Logan, *Punitive Damages in Automobile Cases,* 11 Federation of Insurance Counsel 59 (1960); Note, *Exemplary Damages in the Law of Torts,* 70 Harv L Rev 517 (1957); Comment, *Insurer's Liability for Punitive Damages,* 14 Mo L Rev 175 (1949); Note, *Insurance: Liability Insurance: Recovery of Punitive Damages,* 14 Okla L Rev 220 (1961); Note, *Insurance Coverage and the Punitive Award in the Automobile Accident Suit,* 19 U Pitt L Rev 144 (1957); Note, *Automobile Liability Insurance and Punitive Damages,* 39 Temple L Q 459 (1966); Comment, *Punitive Damages and Their Possible Application in Automobile Accident Litigation,* 46 Va L Rev 1036 (1960); 46 Iowa L Rev 645, 650 (1961); 40 Mich L Rev 128 (1941).

Upon an examination of all authority, I can find no persuasive reasoning for allowing insurance to shift punitive damage liability in Oregon. Upon an examination of the cases holding that it can be shifted, it is apparent that either the rationale for such damages (when given) is not applicable under Oregon law or the reasoning is not cogent. I shall proceed to examine all rationales advanced by those cases and, in doing so, enlarge in some instances on comments already made.

The first rationale is that punitive damages are really compensatory. As indicated, Oregon has a plethora of cases which hold that the sole basis for punitive damages is deterrence.

The second rationale is that punitive damages do not actually deter reckless or wanton driving after drinking, and, therefore, insurance coverage for such damages does not actually interfere with public policy. As previously indicated, we rejected the basic premise of this reasoning in *Harrell v. Ames, supra,* 265 Or at 190-91.

The third rationale is that criminal sanctions without punitive damages provide adequate deterrence. We recently rejected this suggestion in *Roshak v. Leathers,* 277 Or 207, 560 P2d 275 (1977).

The fourth rationale is that a judgment for punitive damages will deter reckless or wanton driving even if the judgment is paid by an insurance company, since increased insurance rates will punish and deter the offending driver. This is an extremely inefficient way to carry out the policy of determent, involving as it does the imposition on insurance companies (and thus on the public) of financial liability which does not directly further any deterrence purpose. It is patent that little deterrence would result, and we have recognized that minimal deterrence is insufficient. See the previous quotation from *Harrell v. Ames, supra,* 265 Or at 190.

The fifth rationale is that the possibility of liability in excess of policy limits will adequately deter. Such deterrence would be far less than it would otherwise be if punitive damages could not be covered by insurance, and we have made it clear that the slaughter on the highways makes maximum deterrence necessary. Again, *see, Harrell v. Ames, supra,* 265 Or at 190. Moreover, this and the other arguments which seek to minimize the deterrence aspect of punitive damages, or to substitute deterrence from some other source, fail to recognize that if punitive damages are not themselves a deterrent, there is no rationale to support them in the first place.

The sixth rationale is that because the terms of the insurance policy are broad enough to protect against

punitive damages, the insured expected to be so protected, and this expectation should be honored. This reasoning misses the point. We may assume that the parties intended to contract for the coverage of punitive damages, but the issue remains whether public policy permits such a contract to be enforced. In determining public policy, we determine not what people expect but what the public interest demands that they should expect. Were we bound by the insured's expectation of protection against punitive damages, we could not have affirmed the judgment for punitive damages in *Harrell v. Ames, supra.* We would have been required to hold that there was no point in awarding a judgment for punitive damages against defendant's insured since insurance coverage made it impossible to punish her with such a judgment. *Cf. Ashcraft v. Saunders,* 251 Or 139, 144, 444 P2d 924 (1968).

Plaintiff cites 15 Couch on Insurance § 56:27 (2d ed 1966) and 7 Appleman, Insurance Law and Practice § 4312, in support of this rationale for permitting coverage for punitive damages. Language purporting to be from the 1972 Supplement to the section of Appleman is quoted by the Supreme Court of Idaho in *Abbie Uriguen Olds. Buick, Inc. v. United States F. I. Co., supra,* 511 P2d at 787:

> "* * * It seems strangely inconsistent for an insurer, in one breath, to admit liability for compensatory damages, and then to deny liability for that part of an award claimed attributable to reckless or wanton conduct. * * *."

I see no strange inconsistency. It appears that the commentator is confused about what makes punitive damages different from compensatory damages for purposes of the issue before us. The difference lies not in the conduct of the insured, as the commentator seems to think. The same conduct gives rise to both compensatory and punitive damages. The difference lies rather in the purpose of the two kinds of damages. The purpose of compensatory damages is to compen-

sate, and this purpose is carried out no matter who is held ultimately responsible for payment. The purpose of punitive damages, on the other hand, is to deter, and this purpose is not carried out if the one who ultimately pays is an insurer rather than the wrongdoer.

The seventh rationale appears in some states in which *respondeat superior* liability attaches to employers for punitive damages awarded against their employees. *Cf. Farris v. U. S. Fidelity & Guaranty,* 273 Or 628, 636, 542 P2d 1031 (1975). The rationale is that since courts allow employers to insure against such liability, they should allow individuals to have the same protection against punitive damage awards. Courts which use this reasoning do not seem to realize that the cases which allow employers such protection are based on the premise that there is no point in attempting to deter employers who are not able to prevent wanton or reckless acts by their employees. *It does not follow* that employers or others should be able to insure themselves against punitive damages for their own culpable conduct.

The final rationale appears in *Dairyland County Insurance Co. v. Wallgren, supra,* in which the Texas court relied on the prescription and approval of insurance policy language by the state insurance commission under a delegation of legislative authority. The court treated the approval of the policy language as a statement of public policy by the legislature through the commission favoring coverage for punitive damages. In Oregon there is no such approval or other indication of a legislatively established public policy.

The majority opinion is a typical example of what happens when a result is forced. The specter of what juries may do under the guise of punitive damages to persons who really have not greatly sinned is used to reach a completely illogical result. If the majority opinion is correct that this great danger does exist, the remedy is not to allow people to insure against the contingency, so as to give windfalls to plaintiffs with

no deterrent effect, but to abolish punitive damages. I dissent.

Denecke, C. J., concurs in this dissenting opinion.

**LINDE, J.,** dissenting.

I agree with much of the court's opinion but not with its application in this case.

The precise question before the court is whether a plaintiff who has been awarded both compensatory and punitive damages for injuries caused by a reckless and intoxicated driver may not collect the punitive damages under the driver's liability insurance contract with defendant, because insurance coverage for such an award would violate a public policy.[1]

Justice Holman's opinion asserts, and the majority denies, that such a public policy is necessarily implied in the grounds for awarding punitive damages in the first place. Thus, if there is a public policy forbidding recovery under the insurance contract in this case, it is at best a court-made policy derivative from and in aid of the court's premise for the underlying award of punitive damages. The answer, in my view, should not be treated as general doctrine for the insurability of all "punitive" or similar claims beyond straight compensation.

A court-made public policy against otherwise lawful liability insurance can be defended, not *because* the purpose of punitive damages is always deterrence and *because* insurance will always destroy their deterrent effect, but only *when* these considerations apply. Neither premise is true in all cases. The court's frequent statements that punitive damages are meant to deter are true of any sanction in the sense that society would prefer avoidance of the harmful conduct and hopes the sanction will discourage it. A leading

---

[1] I agree with the court that if coverage of punitive damages is legally proper, the insurance policy contained nothing to put a purchaser on notice that such damages were excluded.

student of punitive damages long ago pointed out that compensatory damages based on fault similarly rest on deterrence of harmful conduct; yet arguments against liability insurance on that ground were long since rejected.[2] But aside from deterrence, statutory or common law measures of recovery beyond actual compensation may be designed to make a private suit worthwhile where individual damages are small or difficult to prove, or to channel plaintiff's anger from retaliation into a court when the tort is to his dignity more than to his pocketbook, or they may simply reflect social outrage apart from any remedial purpose.[3]

In turn, a public policy governing insurance against such liability may be derived from state or federal legislation, *see Dairyland County Ins. Co. v. Wallgren,* 477 SW2d 341 (Tex Civ App 1972),[4] or implied from the legislative or judicial premise of the underlying liability itself. Where that premise is simply outrage at willful misconduct, liability for punitive damages will be uninsurable on the same principle as liability for a criminal fine. *Cf., Isenhart v. General Casualty*

---

[2] N. Morris, *Rough Justice and Some Utopian Ideas,* 24 Ill L Rev 730 (1930); Morris, *Punitive Damages in Tort Cases,* 44 Harv L Rev 1173 (1931); *see* Appleman, Insurance Law and Practice, § 452. Professor Morris also called for more empirical evidence on the circumstances under which punitive damages do or do not serve as an added deterrent beyond ordinary civil or criminal liability, 44 Harv L Rev supra at 1206, but nearly a half century later such judgments still reflect a search for a rational premise more than confidence in its realism.

[3] To say that a social purpose, *e.g.,* deterrence, is the only *justification* for a sanction is not to say that it is its only *explanation,* as the long-standing debates over the scope and purposes of criminal punishment show.

[4] If a legislative policy toward the contract or the claim at issue can be discerned in some relevant enactment or regulation, it will be the governing "public policy." *Wheeler v. O'Connell,* 9 NE2d 544 (Mass 1937); *Hartford Acc. & Ind. Co. v. Wolbarst,* 57 A2d 151 (NH 1948); *compare, United States v. Atlantic Mutual Ins. Co.,* 343 US 236, 72 dS Ct 666; 96 L Ed 907 (1951). But a search of relevant Oregon statutes and regulations reveals no policy pertinent to insurance coverage for the punitive damages in this case.

*Co.,* 233 Or 49, 377 P2d 26 (1962).[5] If statutory recovery beyond compensation aims at letting private plaintiffs with small claims hold defendants to socially responsible conduct, a derivative public policy against insurance is not so easily implied. Deterrence as an aim of punitive damages is most plausible when addressed to a deliberate, repeated or continuous course of conduct, for instance when it is profitable to take the risk of occasional liability for the actual damages done to others, *see, e.g., McElwain v. Georgia-Pacific Corp.,* 245 Or 247, 421 P2d 957 (1966), *Cf., Kinzua Lumber Co. v. Daggett,* 203 Or 585, 281 P2d 221 (1955), or when a defendant is prepared for a noneconomic purpose to pay the economic cost of an injury he imposes on another, such as cutting a neighbor's trees to gain a view, *Fisher v. Carlin,* 219 Or 159, 346 P2d 641 (1959). Even then, the deterrent effect on an enterprise may not in fact be much different whether the enterprise negotiates an insurance premium for the contingency of punitive damages or must provide for that contingency itself. In a case of unanticipated or nonrecurring liability the effect may be quite different. Of course, it is not always possible to match a rule precisely to its reason; a line must be broad enough to be visible to courts and

[5] Justice O'Connell's explanation in *Isenhart,* though addressed to an intentional tort, is pertinent to the public policy issue in this case:

"A contract to indemnify the insured for damages he is forced to pay as a result of an intentionally inflicted injury upon another should not be regarded as contrary to public policy unless the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character. Plaintiff contends that a person's decision as to whether he will intentionally inflict an injury upon another will not ordinarily turn upon the existence or non-existence of insurance covering the insured's loss resulting from an action brought against him for such conduct. Generally this is probably true, although depriving insured of coverage for intentionally inflicted injuries might have such a deterring effect in some cases. However, punishment rather than deterrence is the real basis upon which coverage should be excluded. A person should suffer the financial consequences flowing from his intentional conduct and should not be reimbursed for his loss, even though he bargains for it in the form of a contract of insurance. * * *" *Isenhart v. General Casualty Co.,* 233 Or 49, 52-53, 377 P2d 26 (1962).

[ 233 ]

counsel. Where the threat of overcompensating damages is addressed squarely to deterring the conduct charged to a defendant, it will often be reasonable, in the absence of other policy sources, to imply that the potential defendant is not to insure against the deterrent.

The difficulty when we turn to the present case is that punitive damages for reckless driving while drunk are rather implausibly explained as a deterrent. A defendant who has not been deterred by the sanctions of criminal punishment, loss of license and risk of death or serious injury to himself and others, is not likely to be deterred by the probably unknown fact that his insurance policy will not cover the equally unfamiliar assessment of punitive damages,[6] and as a lesson "not to do it again," this is too random and destructive a stroke to the average family's resources compared with, for instance, stricter enforcement of license revocation laws. If the matter were open, I would not ground punitive damages in this kind of case on a theory of deterrence.

But the matter is not open. The punitive damages involved here were awarded by a jury under express instructions to set them at the amount required as a deterrent, and this court affirmed on that premise, *Harrell v. Ames,* 265 Or 183, 508 P2d 211, 65 ALR3d 649 (1973), as is set forth in Justice Holman's dissent in the present case. That decision fixes the premise of punitive damages for this case, whether or not one shares it; and given the premise, recovery from the liability insurer is an anomaly. It is not easy to speculate what amount of damages, when recoverable under an automobile liability insurance policy, "would be required to discourage the defendant and others from engaging in such conduct in the future."

---

[6] One review of the available information concluded that the role of civil liability in deterrence is "much discussed but little understood." Cramton, *Driver Behavior and Legal Sanctions: A Study of Deterrence,* 67 Mich L Rev 421, 445 (1969).

For this reason, I dissent from the disposition of this case.